IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs October 7, 2025

**STATE OF TENNESSEE v. DARRELL PETERSON**

**Appeal from the Criminal Court for Shelby County**
**No. 21-00639       Chris B. Craft, Judge**

_____

**No. W2024-01573-CCA-R3-CD**

_____

A Shelby County jury convicted the Defendant, Darrell Peterson, of one count of first degree premeditated murder, two counts of attempted first degree murder, and two counts of employing a firearm during the commission of a dangerous felony. The trial court imposed a life sentence plus twenty-five years. On appeal, the Defendant contends that the evidence is insufficient to support his convictions, and the trial court improperly ordered consecutive sentencing. After review, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, P.J., delivered the opinion of the court, in which TIMOTHY L. EASTER and JOHN W. CAMPBELL, SR., JJ., joined.

Gerald S. Green, Memphis, Tennessee, for the appellant, Darrell Peterson.

Jonathan Skrmetti, Attorney General and Reporter; Raymond J. Lepone, Assistant Attorney General; Steven J. Mulroy, District Attorney General; and Samuel D. Winnig, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**
**I. Facts**

This case arises from a neighborhood dispute. On May 16, 2020, two groups of "girls," their ages unclear, living across from one another on Wellons Avenue in the Frayser area of Memphis, Tennessee, were arguing outside their homes. The Defendant arrived to check on the safety of his nieces and nephews, at the request of one of his sisters. Ultimately, the Defendant fired a gun at the parents of some of the girls involved in the dispute, hitting and killing a neighbor, Patricia Bryant, who was watching the events unfold from her yard. A Shelby County grand jury indicted the Defendant for the first degree murder of Patricia Bryant (Count 1), the attempted first degree murder of Marlon Vassar

(Count 2), the attempted first degree murder of Demetrice Clark (Count 3), employing a firearm during a dangerous felony (Counts 4 & 5), and being a felon in possession of a firearm (Count 6).[1]

At trial, the parties presented the following evidence: James Bryant and his wife, Patricia Bryant, lived on Knob Drive in Memphis, Tennessee. Their house ("the Knob house") was situated at the corner of the intersection of Knob Drive and Wellons Avenue. Mr. Bryant recalled that his wife was known as the "candy lady" in the neighborhood because she sold candy and drinks from their home. On May 16, 2020, Mr. Bryant was doing yard work when he heard a commotion up the street. He went around the corner of his home and witnessed the commotion on Wellons Avenue that he recalled involved "bats, sticks, [and] knives."

Mr. Bryant went inside their home and told Ms. Bryant about the commotion. She wanted to see what was going on, so the couple returned outside together. They stood at the corner of Knob Drive and Wellons Avenue, looking "up" Wellons Avenue. Mr. Bryant said they could not see much, but he suddenly heard two-gun shots. He described what happened next, saying, "I turned around to tell [Ms. Bryant], 'Hey, they shooting. Come on[,] let's go.' By [the] time I looked around, [Ms. Bryant] was hitting the ground. Killed my wife. When they killed her, they killed me." When Ms. Bryant was shot, she was holding her one-year-old grandson. Mr. Bryant believed that his wife turned as the gunfire began to shield their grandson from being hit.

As to the source of the commotion, Mr. Bryant stated that he did not know the people who were involved or what caused the commotion. He described Ms. Bryant and himself as "innocent bystanders." Mr. Bryant confirmed that neither he nor his wife were involved in the altercation on Wellons Avenue.

Ms. McGinnis also lived on the south side of Wellons Avenue. Ms. McGinnis had lived there for six years and knew the neighbors in the area well. She confirmed that she knew the Bryants and described Ms. Bryant as "a nice person." On May 16, 2020, Ms. McGinnis was at home when she heard "some girls" arguing outside. She went to the door and could see "the girls" "fussing back and forth." She explained that one group of the girls involved in the dispute lived on the south side of Wellons Avenue and the other group of girls lived on the north side of Wellons Avenue.

Ms. McGinnis recalled that when she left her house, she saw a woman wearing a security uniform. The woman was later identified as Bernautica McClure, one of the

---

[1] The State dismissed, Count 6 of the indictment, felon in possession of a firearm, before trial.

2

Defendant's sisters. Ms. McClure "chased the girls across the street back up in their yard and she ran them in the house ["Wellons house"]." She then got back inside her car and drove toward Knob Drive. She stopped briefly to speak to "one of them," who had picked up a brick. Ms. McClure then continued toward the intersection of Knob Drive and Wellons Avenue and turned right onto Knob Drive.

After about ten minutes, Ms. McClure returned at the same time as a man who was driving a red SUV, later identified as a red Hyundai Santa Fe ("red Hyundai"). The man, later identified as the Defendant, exited the red Hyundai and opened the rear hatch. He took off his tennis shoes and put on some boots. "[T]he girls" began yelling, "He's finna shoot," and the Defendant responded, "No." A white GMC SUV ("white GMC") arrived and a woman, carrying a baseball bat, exited the white GMC and, along with several other women, walked to the front of the Wellons house and broke the front window. The group fled, and the Defendant returned to his vehicle. Another car, a gold Monte Carlo, arrived with Demetrice Clark, the mother of the girls who had been chased into the Wellons house. When they arrived, the Defendant exited his vehicle and fired two shots toward the mother, Demetrice Clark, and Marlon Vassar. The State introduced cell phone video recordings of the incident that were consistent with Ms. McGinnis's testimony about the vandalism and shooting.

After the Defendant fired his gun, Ms. McGinnis heard Mr. Bryant call out that his wife had been shot. Ms. McGinnis saw Mr. Bryant holding Ms. Bryant as she collapsed to the ground. Ms. McGinnis ran to Mr. Bryant and offered assistance.

Ms. McClure, the Defendant's sister, testified that she was charged with vandalism related to this case. She recalled that in May 2020, she lived with her sister, Diamond Speed[2], on Wellons Avenue. On May 16, 2020, Ms. McClure came home from work to find a "fight on the street." At the time, Ms. McClure worked at PFS Webb as a security guard. She identified herself as the woman in the video recordings wearing a security guard uniform.

Ms. McClure drove a black Lexus and parked the car in the driveway. Ms. McClure's two nieces and two nephews were in the car with her. They all went inside the house, and then Ms. McClure came back out and talked to her friend "Tony." As she stood outside, she watched a girl from across the street, carrying a knife, enter the yard, where Ms. McClure's nephew was playing. Ms. McClure asked the girl to "remove herself." Ms. McClure stated that the Defendant was not present at this time and arrived approximately thirty minutes later. Ms. McClure said that she believed the girl was going to stab her.

---

[2] Diamond Speed did not testify at trial and was referred to by witnesses as "Diamond Speed" and "Diamond Peterson." For purposes of clarity, we refer to her as "Ms. Speed."

3

Ms. McClure explained that she was holding a bat in the video recording because she had taken the bat away from her niece. She also identified two women who arrived in a white GMC as Ms. Diamond Speed and Debra Prettie, two of Ms. McClure and the Defendant's sisters. Ms. McClure, her sisters, and her niece walked up to the Wellons house and "kicked out their windows." Ms. McClure explained that they broke the windows out of "anger." The girls who were inside the house did not come out during or after the vandalism but remained inside. Ms. McClure returned to her car when the gold Monte Carlo pulled up "about a house down." Ms. McClure did not know the people in the gold Monte Carlo, but she agreed that the video showed the Defendant exiting the car and walking toward the gold Monte Carlo and firing his gun.

Ms. McClure testified that, immediately following the shooting, she drove to her friend's house with her nieces and nephews before driving to the house of another of her sisters, "Mary."

Ms. Prettie, the Defendant's sister, testified that she was present during the May 16 shooting and was charged with vandalism of the Wellons house. Ms. Prettie lived in Ridgecrest at the time of this incident, but her sister, Ms. Diamond Speed, lived on Wellons Avenue. On the afternoon of May 16, 2020, Ms. Speed drove Ms. Prettie in a white GMC to Wellons Avenue at Ms. McClure's request. After speaking with Ms. McClure, while en route to Wellons Avenue, Ms. Prettie called the Defendant and asked him to go to Ms. Speed's home to check on Ms. Speed's children. When Ms. Prettie and Ms. Speed arrived at Wellons Avenue, "everybody" was outside, and the Defendant was present.

Ms. Prettie exited the white GMC and walked up to the Wellons house, the home of the girls involved in the dispute, and "kicked the window in." She did not have an explanation for why she kicked in the window other than she "blanked out." After kicking in the window, she returned to the white GMC. Once Ms. Prettie was back inside the white GMC, she heard gunfire. Ms. Speed got into the driver's seat and drove to their sister's house.

Demetrice Clark and Marlon Vassar lived at the Wellons house with Ms. Clark's children. On May 16, 2020, Ms. Clark and Mr. Vassar were at a barbecue when Ms. Clark received a phone call from her ex-husband notifying her that her home had been vandalized. Mr. Vassar drove Ms. Clark home where they saw a group of people standing in the street and the front windows of their home broken. They exited Mr. Vassar's gold Monte Carlo, and Mr. Vassar saw the Defendant run down the street shooting at them. Consistent with Mr. Vassar's account, Ms. Clark recalled that, after she exited the vehicle, she heard gunfire. She tried to run but slipped and fell. She got back up and ran inside the house with Mr. Vassar, urging her children to "go to the back."

4

Ms. Clark did not know the Defendant. She described him as 5'9" and approximately 140 pounds and that he had been wearing a white shirt with red shorts. Neither Ms. Clark nor Mr. Vassar were armed at the time of the shooting. Ms. Clark said she watched the Defendant approach and then begin shooting at her. She did not know why the Defendant was shooting at her, reiterating that she did not know him. Once inside her house, she heard people outside saying that "he shot the candy lady." The State played the video recordings of the incident and Mr. Vassar identified his vehicle, the gold Monte Carlo, arriving at the Wellons house.

Memphis Police Department ("MPD") Lieutenant Darryl Dotson responded, on May 16, 2020, to a "chaotic" shooting scene at the corner of Knob Drive and Wellons Avenue. When he arrived, he designated officers to render first aid to the victim of the shooting, Ms. Bryant, and then assigned other officers to establish an inner perimeter and an outer perimeter to secure the crime scene. Lieutenant Dotson requested that a crime scene investigator photograph and create a diagram of the scene. The diagram was to include the Wellons house and the Knob house. Ms. Bryant was lying on the ground outside the Knob house. At the time of his arrival, the paramedics were preparing to transport the victim to the hospital.

At the Wellons house, the crime scene investigator photographed the broken window. On Wellons Avenue in front of the residence, crime scene investigators photographed two TulAmmo .380 caliber shell casings lying on the road.

MPD Officer Charles Cathey worked in the Crime Scene Investigation unit. Officer Cathey processed two vehicles related to these crimes: the red Hyundai that the Defendant drove and the white GMC that Ms. Diamond Speed drove. Officer Cathey had photographed the red Hyundai, and the trial court entered the photographs into evidence. Inside the white GMC, Officer Cathey recovered a wooden baseball bat from the front passenger side of the vehicle. He also collected a knife found between the driver's seat and the center console.

MPD sergeant Veronica Crutchfield participated in the investigation of the Wellons Avenue shooting. The lead detective on the case, Mark Leasure,[3] received several phone calls and text messages about the shooting. Sergeant Leasure had worked many years in the Frayser area of town where the shooting occurred and had developed "a very close knit relationship" with the residents of the area. Several people living in the Frayser area provided Sergeant Leasure with video that officers at the precinct watched. Based on his

---

[3] By the time of trial, Sergeant Leasure was deceased.

familiarity with the neighborhood, Sergeant Leasure recognized some of the people in the video.

Sergeant Crutchfield, along with Sergeant Leasure, watched video of the verbal altercation and also a live feed of the victim lying on the ground at the corner of Wellons Avenue and Knob Drive. Sergeant Crutchfield summarized what they had seen on the video recording of the events leading up to the shooting, as follows:

[I]t started with . . . three families. Two families that was on the left side of Wellons. And another family of two sisters that were across the street. And at one point, all of them was outside arguing, screaming. They had butcher knifes [sic] and bats at that time.

One of the family members, who was just recorded when a second family member that had on a security guard outfit. She at that time engaged the two girls across the street at [ ] Wellons. The girls went back on the porch. The security guard that had a bat at that time was just walking in the street and they was just verbally cursing each other out.

And at one point, the security guard along with two more females, go into . . . an altercation with the two females that was across the street in the same house at [ ] Wellons.

. . . .

[A] red SUV vehicle pulled up going westbound on Wellons. . . . Male/black get [sic] out, tall brown skin, white tank top T-shirt. He was approached by the female/black that had the bat with the security uniform on. At that point, [the Defendant exited his vehicle], take off some black possible Nike slide in sandals, change into some brown boots.

At that time, . . . an unknown male . . was trying to talk to the [Defendant] to get him to calm down. At that time, [the Defendant] got with three female/blacks including the . . . security guard. They approached the Wellons house where the two girls were on the porch. As they approached coming up the driveway, the [girls] retreated inside the residence.

At that point, their home was vandalized by the three female/blacks and the [Defendant] was also up on the porch at the time when that incident happened.

6

In another video clip, Sergeant Crutchfield watched the Defendant and the women who had vandalized the Wellons house retreat from the Wellons house. The Defendant got into his red Hyundai and made a U-turn on Wellons Avenue and parked on the south side of the street and then waited in his vehicle. A short time later, the gold Monte Carlo parked in front of the Wellons house in the same direction as the red Hyundai. Two people, Ms. Clark and Mr. Vassar, exited the gold Monte Carlo and by the time they walked to the sidewalk, the Defendant had exited his red Hyundai and fired two shots in the direction of Ms. Clark and Mr. Vassar. The video recording showed Ms. Clark and Mr. Vassar run inside the Wellons house, and the Defendant get back into the red Hyundai and drive away.

Once Sergeant Crutchfield and Sergeant Leasure arrived at the scene, they spoke with neighbors about what they had observed. As they spoke with neighbors they developed the name, "Darrell." Sergeant Leasure engaged other officers to transport witnesses to the police precinct where officers took statements from these witnesses. Police also issued a BOLO ("Be On the Look Out") for the Defendant's red Hyundai, which included the vehicle tag number that was obtained from the video footage. The red Hyundai was registered to Kiara Taylor, the Defendant's girlfriend at the time. Sergeant Crutchfield identified the house involved in this altercation and shooting in photographs taken at the scene. She estimated that it was approximately a little over 200 feet from the Wellons house to the corner where Ms. Bryant was shot. Sergeant Crutchfield confirmed that the gun used in the shooting was never recovered.

Dr. Juliette Scantlebury, a forensic pathologist at West Tennessee Regional Forensic Center, testified as an expert witness in the field of forensic pathology. Dr. William Segal performed the autopsy related to his case; however, Dr. Scantlebury had reviewed the records of the autopsy performed on the victim. The autopsy revealed a gunshot entrance wound on the right side of the victim's chest. Based upon the internal examination, Dr. Scantlebury testified that the bullet traveled from the front of the victim's body to the back and from the right side of the body to the left and downward. The bullet injured the right seventh rib, the spine, the liver, and the aorta. Dr. Scantlebury opined that the cause of Ms. Bryant's death was gunshot wound of the torso and the manner of death was homicide.

After hearing this evidence, the jury convicted the Defendant of one count of first degree premeditated murder, two counts of attempted first degree murder, and two counts of employing a firearm during a dangerous felony. After a sentencing hearing, the trial court imposed a life sentence for the first degree murder conviction (Count 1); fifteen-year sentences for each of the attempted first degree murder convictions (Counts 2 & 3); and ten years for each of the employing a firearm convictions (Counts 4 & 5). The trial court considered consecutive sentencing criteria. Finding two criteria applicable, the trial court ordered the sentences for Count 2 and Count 3 to run concurrently to each other but consecutively to Count 1. The trial court ordered the sentences in Count 4 and Count 5 to

7

run concurrently to each other, but Count 4 would run consecutively to Count 2 and Count 5 would run consecutively to Count 3, for a total effective sentence of life plus twenty-five years. It is from these judgments that the Defendant appeals.

## II. Analysis

On appeal, the Defendant contends that the evidence is insufficient to sustain his convictions and that the trial court improperly found he was a dangerous offender for purposes of consecutive sentencing.

### A. Sufficiency of the Evidence

The Defendant asserts that the evidence is insufficient to support his convictions because the State failed to prove premeditation and the intent to kill. The State responds that there was sufficient proof upon which a jury could find, beyond a reasonable doubt, that the Defendant acted with premeditation and intent. We agree with the State.

When an accused challenges the sufficiency of the evidence, this court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the

weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)). This court must afford the State of Tennessee the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" that may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000) (citations omitted).

First degree murder is defined as a "premeditated and intentional killing of another." T.C.A. § 39-11-302(a)(1) (2018). Intentional refers to when "a person who acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result." T.C.A. § 39-13-202(a)(1) (2018). Premeditation refers to "an act done after the exercise of reflection and judgment." T.C.A. § 39-13-202(e) (2018). Whether the defendant premeditated the killing is for the jury to decide, and the jury may look at the circumstances of the killing to decide that issue. *Bland*, 958 S.W.2d at 660. The Tennessee Code states that, while "the intent to kill must have been formed prior to the act itself," that purpose need not "pre-exist in the mind of the accused for any definite period of time" for a defendant to have premeditated the killing. T.C.A. § 39-13-202(e).

The following factors have been accepted as actions that demonstrate the existence of premeditation: the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, declarations by the defendant of an intent to kill, evidence of procurement of a weapon, preparations before the killing for concealment of the crime, and calmness

9

immediately after the killing. *Bland*, 958 S.W.2d at 660. In addition, a jury may consider destruction or secretion of evidence of the murder and "the planning activities by the appellant prior to the killing, the appellant's prior relationship with the victim, and the nature of the killing." *State v. Nichols*, 24 S.W.3d 297, 302 (Tenn. 2000); *State v. Halake*, 102 S.W.3d 661, 668 (Tenn. Crim. App. 2001) (citing *State v. Gentry*, 881 S.W.2d 1, 4-5 (Tenn. Crim. App. 1993)). Also, "[e]stablishment of a motive for the killing is a factor from which the jury may infer premeditation." *State v. Leach*, 148 S.W.3d 42, 54 (Tenn. 2004).

As relevant in this case, criminal attempt occurs when a person "acting with the kind of culpability otherwise required for the offense . . . [a]cts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part[.]" T.C.A. § 39-12-101(a)(2) (2018).

Tennessee Code Annotated section 39-17-1324(b)(1) provides that, [i]t is an offense to employ a firearm during the . . . [c]ommission of a dangerous felony [.]" First degree murder is specified as a dangerous felony. T.C.A. § 39-17-1324(i)(1)(A) (2018).

The evidence, viewed in the light most favorable to the State, showed that the armed Defendant went to check on his nieces and nephews at the request of his sister. He arrived at Wellons Avenue and watched as his sisters vandalized the Wellons house. He returned to his red Hyundai, moved his car to the same side of the street as the vandalized house, and then waited. When Ms. Clark and Mr. Vassar arrived at the Wellons house to check on Ms. Clark's children following the dispute, the Defendant exited the red Hyundai, and while walking toward Ms. Clark and Mr. Vassar, fired his gun twice at them. The bullets missed Ms. Clark and Mr. Vassar, but struck Ms. Bryant who was watching the events from her yard at the corner of Knob Drive and Wellons Street. The Defendant then returned to the red Hyundai and drove away. Video evidence and eye witness testimony supported these facts.

With respect to whether the Defendant acted intentionally, we conclude that the evidence supports that, when alerted to a dispute related to his family, he drove to the Wellons house armed with a weapon. He stood by as his sisters vandalized the Wellons house and then waited for the homeowners to arrive. He got out of his vehicle, fired at them, and then fled. This conduct demonstrates that the Defendant intended to "cause the result," the death of a person. *See Millen v. State,* 988 S.W.2d 164 (Tenn.1999).

Factors that are relevant to the consideration of premeditation are present in this case. The motive was a heated dispute between members of the Defendant's family and some neighbors who lived across the street. After being notified by his sister, the Defendant went armed to Wellons Avenue. After his sisters vandalized the Wellons house

out of "anger," he moved his car to the same side of the street as the Wellons house and waited. As soon as Ms. Clark and Mr. Vassar, who were unarmed, exited their vehicle to check on their home that had been vandalized and Ms. Clark's children, the Defendant walked toward them, firing his gun at them twice. After shooting and hitting Ms. Bryant, he fled the scene. The gun used in the shooting was never recovered. This is sufficient evidence for the jury to conclude that the Defendant acted with premeditation when he fired a gun at Ms. Clark and Mr. Vassar, killing Ms. Bryant. Further, there was sufficient evidence to support the jury's finding that the Defendant employed a gun with the intent to use the gun to accomplish the first degree murder.

Accordingly, we conclude that there is sufficient evidence to support each of the Defendant's convictions. He is not entitled to relief as to this issue.

### B. Partial Consecutive Sentences

The Defendant contends that the trial court erred in applying partial consecutive sentencing because it failed to adequately address the fact that his crimes stemmed from one criminal transaction. The State responds that the trial court made adequate findings to support the imposition of partial consecutive sentencing in this case. We agree with the State.

This court reviews consecutive sentences imposed by the trial court under an abuse of discretion standard with a presumption of reasonableness. *State v. Bise*, 380 S.W. 3d 682, 707 (Tenn. 2012); *State v. Pollard*, 432 S.W.3d 851, 859-60 (Tenn. 2013). The party appealing a sentence bears the burden of establishing that the sentence was improper. T.C.A. § 40-35-401, *Sentencing Comm'n Cmts*. A trial court may impose consecutive sentencing if it finds by a preponderance of the evidence that one criterion is satisfied in Tennessee Code Annotated section 40-35-115(b)(1)-(7). In determining whether to impose consecutive sentences, though, a trial court must ensure the sentence is "no greater than that deserved for the offense committed" and is "the least severe measure necessary to achieve the purposes for which the sentence is imposed." T.C.A. § 40-35-103(2), (4); *see State v. Desirey*, 909 S.W.2d 20, 33 (Tenn. Crim. App. 1995).

Tennessee Code Annotated section 40-35-115 "creates several limited classifications for the imposition of consecutive sentences." *State v. Moore*, 942 S.W.2d 570, 571 (Tenn. Crim. App. 1996). A trial court "may order sentences to run consecutively if it finds by a preponderance of the evidence that one or more of the statutory criteria exists." *State v. Black*, 924 S.W.2d 912, 917 (Tenn. Crim. App. 1995). Pursuant to statute, consecutive sentencing is warranted when "[t]he defendant is an offender whose record of criminal activity is extensive," or "[t]he defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in

11

which the risk to human life is high." T.C.A. § 40-35-115(b)(1), (2), (4). In imposing consecutive sentences based upon a dangerous offender status, it is necessary that "the terms reasonably relate to the severity of the offenses committed and are necessary in order to protect the public from further serious criminal conduct by the defendant." *State v. Wilkerson*, 905 S.W.2d 933, 938 (Tenn. 1995); *see also State v. Lane*, 3 S.W.3d 456, 461 (Tenn. 1999) (stating that the *Wilkerson* findings that the sentences are necessary to protect the public and reasonably relate to the severity of the offenses apply only to consecutive sentences involving dangerous offenders).

At the sentencing hearing, the trial court considered the criteria involving a finding that the Defendant was an offender whose record of criminal activities was extensive. In support of this criteria, the trial court found:

> [The Defendant's record] shows that he does not care about committing crimes. In the presentence report, at age 20, . . .he committed a burglary, got two years on that in 2004. In 2007, he pled guilty to unlawful possession of a weapon. . . . He got 11 months and 29 [ ] days - - days on that and got probation. Right after being arrested on that within two weeks, he was arrested for possession of marijuana and that was on June the 4th, 2007. He pled guilty to that October 30th, 2007, and then two days later was arrested for . . . possession of marijuana. Just did not care about what the law said.

> And then two months after that, while that . . . second marijuana case was pending, he was arrested for evading arrest on a no driver's license charge and evading arrest charge and got five months on that, 2008, so he did some time. It had no effect on him however. While that case was pending, he was charged with refusing to obey the Magistrates in violation of his probation. And he was committing these crimes while on probation and did 11 months, 26 days. . . .

> Then the following year, possession of marijuana again, a third offense which was a felony, got a year, Class E felony. And also while he had the marijuana, he also had cocaine and got a year for the cocaine charge in 2009. While that was pending . . . he was on bond for that, he committed an aggravated burglary of someone's home on May 14th, 2009, a Class C felony. And while he was on bond . . . was also convicted of possessing drugs. He was arrested for sale of drugs but he was convicted of the drugs, and they gave him probation on that eventually before he went to prison. Has a conviction - - he was arrested multiple times but I'm only mentioning

the ones where he was convicted that weren't dismissed or the victims didn't show up.

Then after doing that time, on November 2015, he was convicted of child abuse, and again, resisting arrest from the police in 2018. And then of course, he has [this case.] But it looked to me like in his whole life, he just -- he did not respond at all to anything. . . . So I find his record of criminal activity is extensive.

The Defendant's criminal history reflects that he has a history of criminal activities that is extensive as is evidenced by his eight criminal convictions, spanning the period between 2004 to 2020. Therefore, the evidence does not preponderate against the trial court's finding consecutive sentencing criteria (2) applicable in this case. Because the statute provides that the trial court can impose consecutive sentencing based upon any one statutory criteria, we need not consider the trial court's finding that the Defendant is a dangerous offender. We note, however, that the record likewise supports the trial court's finding the Defendant a dangerous offender for the purposes of consecutive sentencing.

The Defendant suggests that because his convictions stemmed from a single incident, the trial court should have considered this in determining whether to impose consecutive sentencing. Our supreme court, however, has rejected the argument that "in determining whether to sentence a defendant to consecutive sentences, the trial judge is required to take into consideration the fact that all of the offenses arose out of one single criminal episode or were inspired by the same general intent and minutely limited in both time and space" and held that "the single criminal episode concept . . . is irrelevant to a determination of whether to impose consecutive sentencing." *Gray v. State*, 538 S.W.2d 391, 393 (Tenn. 1976).

Accordingly, the trial court properly ordered consecutive sentencing in this case. The Defendant is not entitled to relief as to this issue.

### III. Conclusion

Based on the foregoing authorities and reasoning, we affirm the trial court's judgments.

_____s/ *ROBERT W. WEDEMEYER*_____
ROBERT W. WEDEMEYER, PRESIDING JUDGE

13